LUCIANO ALICEA, ETC., Plaintiff and Appellant, *v.* EMILIO ANTUÑANO, Defendant and Appellee.

No. 7014. Argued December 4, 1936.—Decided February 17, 1937.

*Angel A. Vázquez* for appellant. *Juan B. Soto* and *Enrique Igaravídez,* for appellee.

Mr. Justice Travieso delivered the opinion of the Court.

It is alleged in the complaint that the plaintiff, a minor, is in the custody and under the *patria potestas* of his mother, Carmen Alicea; that the latter was living in concubinage and carrying on marital relations in Río Piedras with the defendant, Emilio Antuñano, by whom she had a child, the plaintiff, who was born on July 6, 1910; that Carmen and Emilio during the time of their relations and at the time of the conception and birth of Luciano were unmarried and might properly have been married without dispensation; that Emilio treats Luciano as his son publicly and privately and has called him such in conversation with various persons, and that Carmen was known to have been living in concubinage with the defendant during the conception, pregnancy and birth of the plaintiff, the defendant being the only man with whom she had marital relations.

The defendant demurred to the complaint for failure to state facts sufficient to constitute a cause of action and his demurrer was overruled. He answered, denying each and every one of the allegations of the complaint, and the issue having been so drawn, the case went to trial.

The plaintiff presented in evidence a certificate showing the registration of his birth in the Civil Registry. It appears therefrom that he was born on the date set forth in the complaint, July 6, 1910. He then offered as witnesses Luciano Alicea, Carmen Alicea, Isabel Hernández, Aurelio Ramos, Benito Díaz, Reyes Alicea, and Genaro Martínez.

Luciano, the plaintiff, testified in brief that he is the son of Carmen, with whom he has always lived, his father being the defendant "who is sitting over there," pointing him out, who took him to school several times in his automobile and from whom he was accustomed to ask a blessing when he met

him. His father gave him money, made him gifts and publicly treated him as his child.

Carmen Alicea said in substance that Luciano was her son by the defendant, conceived when she was a girl of fifteen or sixteen years. She knew the defendant in 1909, on her farm in Río Piedras, where he went to attend her mother who was ill. A little while after he came, he began to fall in love with her. She gave herself to him. They were both unmarried. When they had been carrying on their relations for six months, she became pregnant. They were living in a room in the rear of a house belonging to Aurelio Ramos. He came constantly to where she was by day and by night. They took their siesta in the room and he stayed with her some nights. Antuñano gave her from a dollar to a dollar and a half daily. When she became pregnant he took her to another farm, to the house of León Figueras, where they continued to live publicly as husband and wife, and there Luciano was born. Some time afterwards he took her again to Ramos's house. Luciano was then six months old and the defendant continued to live publicly with her as husband and wife. He used to call Luciano his son. On cross-examination by the defendant she answered that she was thirty-five years old and that she was then married to Gregorio Maldonado. "When we were living together on the farm, Emilio Antuñano had his residence in Río Piedras, at his parents' home, and he used to go there in the small hours of the night after sleeping with me."

Isabel Hernández, an aunt of the plaintiff, said that she had been living since 1908 with her husband Aurelio Ramos, on the farm "Canta Sapos" which the defendant was managing. Her husband was the overseer. Her mother, who was ill, was living with her, and had called to her her sister Carmen, who was about fifteen years old, to take care of her. Antuñano wanted Carmen as his mistress and she and her husband gave them a room in the house where they took their siesta and spent some nights, as husband and wife. As

a consequence of that, the plaintiff was born, and Antuñano paid the expenses of the confinement, publicly recognizing Luciano as his son. When the child was quite large, she asked the defendant one day what he was going to do with him, and it was decided to send him to school, Antuñano instructing the witness to enter him under the name of Luciano Antuñano, as was done. The defendant took Luciano to and from school many times.

Aurelio Ramos confirms in its entirety the testimony which we have just summarized. We shall copy vervatim only the following part of his testimony:

"Antuñano and Carmen commenced to live together and since the house which he was living in had a little room in the rear, both of them went there every day until one day Antuñano said to him: 'Give me that room there to live with this girl,' and then every day when Antuñano was on the farm, he and Carmen took their siesta there and some nights Antunaño stayed there to sleep and went late at night."

Benito Díaz, upon examination by the plaintiff, said:

"I lived in Emilio Antuñano's house, the man over there (pointing to the defendant) and was employed by him on the 'Zapater' farm, working in the cane. León Figueras was also living there. I knew that Carmen Alicea and Antuñano were living together as husband and wife in León Figueras' house."

Upon cross examination by the defendant:

"Antuñano made no bones about saying that Luciano was his child and that he was very happy because he said that he had turned out to be very intelligent; and every time that he saw him he embraced him and kissed him and said that he was his boy (pointing to the plaintiff) and everybody there knew Luciano and considered him to be Emilio Antuñano's son, because that was public knowledge."

Reyes Alicea, the plaintiff's uncle, testifies that "I knew that Carmen and Antuñano were living in concubinage and that from their marital relations Luciano was born," that

Antuñano called him "brother-in-law" and urged him to take care of Luciano because he was thinking about sending him to be educated in Spain. He used to treat Luciano very affectionately and called him his son publicly.

Genaro Martínez, a schoolmate of the plaintiff, said that the defendant used to bring Luciano to school frequently and used to come and meet him and take him away in his automobile. On the occasions that he was with them he noted that the defendant treated the plaintiff as his son "because Antuñano was his father."

At the conclusion of the testimony of this witness, the record shows the following:

"As final evidence I submit to the consideration of this Honorable Court the perceptual evidence of the Judge, because in fil'ation cases that class of evidence may be availed of when the parties are before the court; the defendant and the plaintiff are before Your Honor and we submit the physical resemblance between them in order that Your Honor may take in into consideration in rendering a final decision in this matter."

The evidence for the defendant consisted in his own testimony and in that of the witnesses A. García Ubarri and Guillermo Morales.

The first said that he knew Carmen Alicea on the farm about 1908 or 1909 and that with her he had "the relations which an employer has with the employees upon a farm and with their families." He was managing the farm and there was on the farm a house inhabited by an uncle of Carmen, married to Isabel Hernández. He never lived under the roof of any house in which Carmen was living. He was living in his parents' house in town. He did not have carnal relations with Carmen nor had he done any act whatever of recognition of the plaintiff. He had not spoken to Reyes Alicea nor with Benito Díaz nor with Isabel Hernández about Luciano. In answer to the question: "And is Luciano Alicea your son?" he answered: "I do not consider him such."

He denied that he had taken Luciano in his automobile and that he had instructed any person whatever to enroll him in school.

Ubarri stated:

"I know Emilio Antuñano, we have been neighbors all of our lives and I live on Georgetti Street in Río Piedras, two doors away from the house where Antuñano lives. I have never known any son of Emilio Antuñano other than the one he has now. I have always seen Antuñano living with his sisters, his father Tiburcio and his present wife."

Morales testified to the same effect as Ubarri.

Upon this testimony the district court dismissed the complaint.

The plaintiff appealed. He contends that the court erred in weighing the evidence and in entering judgment. The appellee in a well-grounded brief contends that the judgment appealed from is the only one which can be entered in this case considering the facts, the law, and the authorities. Since he was asked during argument as to the effect which the decision of this court in *Colón* v. *Heirs of Tristani,* 44 P.R.R. 163 and 45 P.R.R. 219 might have upon the decision of this case, the appellee has filed an additional brief in which he seeks to fix the scope of those decisions.

The trial court commences its statement of the case and its opinion upon which the judgment is based, by stating, as is the case, that the provision of law governing the case is that found in Section 189 of the revised Civil Code of 1902, which so far as material, provides:

"Sec. 189.—A father is obliged to recognize his illegitimate child in the following cases:

"1.     *     *     *     *     *     *     *

"2. When publicly or privately he has shown that it is his child, or has called it as such in conversation, or looks after its education and maintenance.

"3. When the mother was known to have lived in concubinage with the father during the pregnancy or birth of the child, or when the child was born while his parents were engaged to be married."

The court then goes on to say:

"We consider that it has been proved that Carmen Alicea, mother of the plaintiff, was living in San Juan on or about the year 1909, working as a servant in the house of Amancio Pérez. Carmen's mother lived at that time with her other daughter, Isabel Hernández, wife of Aurelio Ramos on a farm called 'Cantasapo' in Río Piedras, then managed by the defendant. Carmen's mother became ill and Carmen was called from San Juan to 'Cantasapo' to her sister Isabel's house to attend her mother. At that time Carmen was very young and Antuñano, who had to visit the farm quite frequently, made love to her, they engaged in amorous relations, although there was no evidence that there was a promise of marriage, to the point of realizing carnal acts. Antuñano, needing a house where he might meet Carmen, asked Aurelio Ramos, his employee, and brother-in-law of Carmen, to give him a room in his house for Carmen, and he did so. Antuñano, who was living in the town of Río Piedras with his parents, used to spend some nights in Carmen's room, and some afternoons, when he was there to look over the farm, he spent the siesta with Carmen in her room. He was accustomed to giving her $1.00 to $1.50 a day, but the evidence does not show that he at any time ate in Carmen's house, limiting himself to staying there some nights and to taking a siesta some afternoons, but maintaining his house and residence in the town of Río Piedras in his parents' home. Things went on this way until Carmen became pregnant, when she, being then about six months pregnant, was moved to Sabana Llana ward in Río Piedras to a house of one León Figueras, where Antuñano, got a room for Carmen to occupy under the same conditions as the one she occupied in Aurelio Ramos' house. While she was living in León Figueras' house the plaintiff was born. The mother and child stayed there some time until they were again removed to Aurelio Ramos' house in a farm known as 'Zapater' and managed by the defendant. Antuñano continued to visit Carmen until the child was two years old, more or less. After that he ceased to give her the daily money."

The court then analyzes the plaintiff's evidence offered in support of the admissions of paternity referred to in Subsection 2 of Section 189 of the revised Civil Code, and concludes that it is insufficient for the following reasons:

"In the first place, it is very improbable that a child born and raised in the country, surrounded by ignorant persons, as was the environment in which the plaintiff was raised, should, at eight or nine years of age, refuse to go to school because he thought he ought to bear his father's name and not that of his mother. What difference would it then make to the plaintiff whether he was called Luciano Alicea or Luciano Antuñano?

"In the second place, if the child was so intelligent, if it was a fact that the defendant wanted to give him a good education and to send him to continue his higher studies in Spain, is it not likewise illogical that the defendant should wait until the child was eight or nine years old and until his aunt Isabel called it to his attention to send him to school?

"In the third place, is it not more than improbable that a father who ceased to contribute to the support of a child when he was two years old, when he most needed support, would be so solicitous and affectionate as to take his child regularly to school, at fixed hours, so that the child, who is healthy, would not have to walk one or two kilometers on foot?

"Similarly we cannot deem it to have been shown that the defendant made the admissions with which he is charged as to the paternity of the plaintiff. It is incredible that the defendant would, every time he went to the farm and without having any reason for it, say to his laborers that Luciano was his child. What reason would he have for saying it? Why would he say to Reyes Alicea, Carmen's brother and Luciano's uncle, that this was his son, if the latter knew it positively, for the reason that he had known about the relations of Antuñano with his sister since the beginning?

"Generally such statements are made to friends who are not really aware of it and who do not know the child and the father presents him as such, when the circumstances require him to do so. But a man who has a natural child does not publish it in the form in which the witnesses for the plaintiff contend. Moreover none of the witnesses who have testified upon this point, have been able to show what motive, what reason moved the defendant to make such statements.

"Upon this second aspect of the case, that is, as to the statements placed in the defendant's mouth with respect to his paternity, as well as the fact of his taking the plaintiff to and bringing him from school, the court does not believe either the plaintiff or his witnesses, not only on account of the manner in which they testified upon that point, but also because of the improbability of their testimony insofar as it touches upon that point.

"The law prohibits an investigation of paternity and for that reason requires that paternity may be proved only for the purposes of a filiation proceeding in the manner specifically provided by law. In the instant case, which is covered by Section 189 of the Civil Code, sub-sections 2 and 3, effective on the date on which the plaintiff was born, paternity may be proved only by one of the following methods:

"(a) Showing that the mother of the plaintiff was known to have lived in concubinage with the father, at the time of the pregnancy or the birth of the child, or when the child was born while his parents were engaged to be married (*relaciones amorosas*), or

"(b) Showing that the father has publicly or privately shown that it is his child, or has called the child such in conversation, or looks after his education and maintenance.

"The result is that it is unavailing to the plaintiff that he has a very great physical resemblance to the defendant, as in fact he has. It is unavailing that we may have a moral conviction, as we do have, that the plaintiff is the defendant's child, if we have not receive this conviction from evidence presented to us the form and manner required by law."

The court below analyzes the law, adopts the rigid criterion that concubinage is "a relation the same as that of husband and wife, *with the single difference,* that in the case of marriage the union is legalized by law while in concubinage there is no such legalization," (italics ours), cites the case of *Gerena* v. *Suau,* 36 P.R.R. 151, analyzes the case of *Román* v. *Heirs of González,* 38 P.R.R. 362, and concludes that since concubinage has not been shown and that since the evidence with respect to the acts of recognition by the defendant is neither strong nor convincing and not worthy of credit, he should and did dismiss the complaint.

Admitting, without deciding it, that the evidence which merited the entire credit of the trial court did not show a true case of concubinage, even so we are convinced that in the light of the latest authority laid down in the case of *Colón* v. *Heirs of Tristani,* 44 P.R.R. 163, the error committed by the trial court in weighing the evidence is manifest.

The principle laid down in the decisions above-mentioned are as follows:

"Isolated evidence of paternity, while insuficient in itself to support an action of filiation based on the enjoyment of the status of a natural child, is nevertheless an important element to be considered with other acts relating to enjoyment of such status, and when taken together with evidence of said acts may be, as in the instant case, sufficient to establish the filiation of the child whose action is based on the possession of the said status.

"When the evidence shows that at the time of conception the mother was the mistress of the putative father; that the latter visited her frequently, gave her money, and paid her rent; that he paid for the services of the midwife who attended the mother; and that he performed certain isolated acts of affection toward the child, such facts, taken together with other details and circumstances appearing from the evidence, suffice to adjudge the child his acknowledged natural son." *Colón* v. *Heirs of Tristani,* 44 P.R.R. 163.

Moreover these principles laid down while Act No. 73 of 1911 (Laws, p. 248) was in force are *a fortiori* applicable in this case which is governed by a statute which did not require, to force a father to recognize his illegitimate child, the continuous enjoyment of the status of a natural child, but merely that the father publicly or privately showed that the child was his or called him such in conversation, or looked after his education and maintenance.

That the plaintiff is the child of the defendant arises from the very facts which the district court found to have been proved is implicit in the statement of the case and in the opinion of that court from the beginning to the end.

And if that basic, substantial fact is apparent, then it ought not to seem strange, improbable, that the defendant made the gestures of recognition which the witnesses for the plaintiff ascribe to him. What would be strange, what would be improbable, would be for him to have acted in any other way.

According to the evidence admitted as true, Antuñano, who was then very young, made love to a child of fifteen years,

who was on the farm which he was managing, and had his way with her; without concealment he asked his overseer to give him a room in his house so that he might be alone with his mistress; when she became pregnant, he moved her to another farm, likewise under his control; there he supported her, there his son was born, and there he continued openly their mutual relations until the child was two years old. What is natural, what is logical, is that the father should act as such with respect to his child, a child whom he called such, and whom he caressed, and as his son thought about his future.

It was later, after years passed, after Antuñano had married and contrary interests had arisen that his attitude changed. That too is a matter of human experience.

Furthermore, what ground would the trial court have to refuse to believe the witnesses with respect to the acts of recognition? We have before us the evidence offered by the defendant. The testimony of Ubarri and Morales is perfectly compatible with the plaintiff's evidence. All that the witnesses for the plaintiff said had happened, could as a matter of fact, have happened without the witnesses for the defendant having necessarily become aware of it, and with respect to the defendant's denial as to the recognition, we do not see what credit the court could have given it when the court itself gave it no credit as to the essential fact of the defendant's relations with the plaintiff's mother.

The discredit then of the evidence upon the recognition is based solely upon the impression which the witnesses for the plaintiff produced upon the trial judge in that part of their testimony, in spite of the fact that they did merit credit in the other part of their testimony; in the improbability of their statements, as the judge himself states.

It frequently happens that witnesses exaggerate, that they embroider facts, that they say more, particularly in cases of

this kind, than what really happened, but that does not mean that their testimony is not in substance true.

Furthermore, why is it strange that the plaintiff, notwithstanding his tender years and his life in the country, should aspire to call the defendant his father? Sometimes the precocity of children is really astounding.

And why should it be considered illogical that it should have been Aunt Isabel who called to the attention of the father the entrance of her nephew in school, in spite of the fact that the father knew that he had an intelligent child? The father did not then live with his child, other interests had come between them. This is explained by the fact that at certain times when he was close to him, was talking to him, his affection was renewed and he felt the natural impulse to carry out his duty and that his resolution cooled when he left him and considered the scope and the consequences of his acts from the other home which he had legitimately built up. This was not true of the aunt in her acts. Her constant unbounded affection led her to insist, calling at every opportunity upon the father's conscience, making him do something, if not all, that he should do.

The failure upon the part of the father to carry out his duty of supporting the child, already grown, is not in fact a rare situation even in the case of legitimate children, and the repeated admissions made before the laborers is in no way improbable if one bears in mind the youth of the father and the intimacy which the isolation of country life brings with it.

After a careful study of the case, the conviction which we have formed is so strong that it requires us to hold that there has here been presented the strong evidence required by the authorities and that the trial judge committed the manifest error with which he is charged in weghing the same, and therefore that a decree of recognition ought to be entered. Consequently, the judgment appealed from must be reversed

and substituted by another for the plaintiff, with an award of costs against the defendant.

Mr. Chief Justice Del Toro took no part in the decision of this case.

Mr. Justice Wolf dissented.